**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
The Honorable Michael E. Romero

| | |
|---|---|
| In re:<br><br>Leroux Creek Food Corporation, LLC<br><br>Debtor. | Case No. 24-15015 MER<br><br>Chapter 11 |
| Edward Stuart Tuft<br><br>Debtor. | Case No. 24-15179 MER<br><br>Chapter 11<br><br>(jointly administered under Case No.24-15015) |

**ORDER DENYING MOTION TO DISMISS AND DENYING CONFIRMING CHAPTER 11 PLAN WITHOUT PREJUDICE**

This matter comes before the Court on: (1) the United States Trustee's ("**UST**") Motion to Dismiss Chapter 11 Case or Convert Chapter 11 Case to Chapter 7 Under 11 U.S.C. § 1112(b) ("**Dismissal Motion**") and the objection thereto filed by Debtor Leroux Creek Food Corporation, LLC ("**Leroux**"); and (2) confirmation of the Joint Plan of Reorganization Dated May 14, 2026 ("**Plan**"), filed by Leroux and Debtor Edward Tuft ("**Tuft**") (collectively, the "**Debtors**"), and the UST's objection thereto.[1]

**BACKGROUND**

Leroux and Tuft commenced the instant Chapter 11 bankruptcy cases on August 27, 2024, and September 4, 2024, respectively. Leroux owns and operates an apple orchard and fruit and vegetable cannery in Hotchkiss, Colorado. Tuft started Leroux in 1986 and is its sole member. Several years of drought and an unexpected "100-year freeze" forced the Debtors into bankruptcy. Shortly after the instant cases were filed, Leroux lost one of its most significant customers, setting back the Debtors' reorganization. However, Leroux has since gained several new customers, added new products to its operation, and believes it will soon be profitable.

The UST filed the Dismissal Motion on March 11, 2026, asserting Leroux's case should be dismissed or converted to Chapter 7 due to, among other things, the

---
[1] ECF Nos. 233, 246, 265, & 276.

unreasonable likelihood that Leroux can be rehabilitated. Leroux objected to the Dismissal Motion and filed the Plan on May 14, 2026. The UST objected to the Plan on many of the same grounds asserted in the Dismissal Motion. As such, the Court determined it would decide the Dismissal Motion and confirmation of the Plan at the same time. The Court held an evidentiary hearing on the Dismissal Motion and Plan confirmation on July 2, 2026. Following the hearing the Court took the matter under advisement.

## ANALYSIS

### A. The Court Will Not Dismiss Leroux's Bankruptcy Case

Section 1112(b) provides that

> (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104 of a trustee or an examiner is in the best interests of creditors and the estate.
>
> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) . . . [2]

The UST asserts three grounds for dismissal under § 1112(b): (1) substantial and continuing loss to or diminution of the estate and lack of reasonable likelihood of rehabilitation pursuant to § 1112(b)(4)(A); (2) failure to timely pay post-petition taxes pursuant to § 1112(b)(4)(I); and (3) failure to pay quarterly fees to the UST pursuant to § 1112(b)(4)(K).

#### *1. Continuing Losses and Unlikelihood of Rehabilitation*

One enumerated cause for dismissal under § 1112(b) is substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.[3] In support of this ground, the UST asserts Leroux's monthly operating reports ("**MORs**") show continuing losses over several months. In particular, the UST

---

[2] 11 U.S.C. § 1112(b)(1)-(2)(A). Any use of the term "Section" or "§" hereafter means Title 11 of the United States Code unless otherwise stated.

[3] 11 U.S.C. § 1112(b)(4)(A).

asserts that from September 2024 to January 2026 the MORs reflect a net decrease of $104,388 in Leroux's cash. The UST also contends Leroux lacks sufficient cash flow to cover its operating expenses and that over the course of the case, Leroux accrued $990,898.00 in unpaid operating expenses. Furthermore, the UST asserts that Leroux has not shown it can generate a profit sufficient to pay its operating expenses, let alone make significant payments to unsecured creditors. Leroux disagrees. Instead, Leroux argues the decrease in cash is not due to continuing losses and diminution, but instead is the result of inventory investment. In support of this argument, Leroux points out that it had ten times more cash at the end of February 2026 ($42,331) than at the end of January 2026 ($4,190). Leroux further asserts the significant drop in cash from December 2026 ($165,202) to January 2026 ($4,190) is due to the purchase of additional inventory, which Leroux made in anticipation of a significant customer's high-volume months. As to the UST's argument that Leroux cannot keep up with its post-petition payables, Leroux argues the UST's view is distorted. Leroux asserts most of the post-petition payables are attributable to Sunfair Marketing ("**Sunfair**") and KickLoad, LLC, d/b/a SuperVeg ("**SuperVeg**"). While the post-petition amounts owed to these creditors may have increased over the course of the case, Leroux argues the increase is not because it hasn't been making payments. Rather, Leroux contends Sunfair and SuperVeg are applying Leroux's post-petition payments to pre-petition debt. As such, the corresponding payable reductions are not captured in Leroux's MORs.

To obtain relief under § 1112(b)(4)(A), the moving party must show both a continuing loss or diminution <u>and</u> absence of a reasonable likelihood of rehabilitation.[4] The relevant inquiry for determining whether there is a continuing loss or diminution is whether the estate is experiencing ongoing financial decline.[5] Rehabilitation requires a showing the debtor's business prospects justify continuance of the reorganization effort.[6] "Addressing the relevant statutory grounds, it is noted that under section 1112(b)(1), the debtor's financial condition must be such as to permit the court to determine that there is no reasonable likelihood that the debtor will be rehabilitated."[7]

The Court concludes the UST has not met its burden to show Leroux is experiencing continuing losses and has no likelihood of rehabilitation such that the case should be dismissed or converted. The UST's summary of Leroux's MORs shows

---

[4] *In re Hyatt*, 479 B.R. 880, 887 (Bankr. D.N.M. 2012) (citing *In re Fall*, 405 B.R. 863, 867 (Bankr. N.D. Ohio 2008), aff'd, 2009 WL 974538 (N.D. Ohio 2009) (emphasis added); *In re Vallombrosa Holdings, LLC*, 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009)); *In re Koffler*, 2026 WL 1399246, at *16 (Bankr. D. Colo. May 18, 2026).

[5] *In re Koffler*, 2026 WL 1399246 at *16 (citing *In re Roberts*, 644 B.R. 220, 229 (Bankr. D. Colo. 2022)).

[6] *In re Brutsche*, 476 B.R. 298, 301 (Bankr. D.N.M. 2012) (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted); *In re Great American Pyramid Join Venture*, 144 B.R. 780, 790 (Bankr. W.D. Tenn. 1992)).

[7] *In re Brutsche*, 476 B.R. at 302.

several months during this case when Leroux was profitable.[8] At trial, Leroux's Chief Operating Officer, Sarah Tuft ("**Ms. Tuft**") testified one of the reasons Leroux suffered losses during the bankruptcy case was that it lost customers, including one of its largest customers, Stonewall Kitchen.[9] However, Ms. Tuft also testified Leroux recently brought on several new customers, including HelloFresh.[10] While Leroux is not recognizing an immediate increase in revenue from its new customers, Ms. Tuft testified it takes time to recognize that revenue because it takes time to make, package, and ship its products to those customers.[11] Leroux believes the revenue it will receive from the new customers will eventually replace the revenue it lost as a result of the departure of the old customers.[12] The Court found Ms. Tuft to be a credible witness. Given this testimony, the Court believes there is a reasonable likelihood Leroux will be rehabilitated. As such, the Court will not dismiss or convert the case on this ground.

*2. Failure to Pay Post-Petition Taxes*

The UST argues the case should be dismissed or converted because Leroux failed to pay post-petition taxes to the Delta County Treasurer (the "**DCT**"). Leroux argues the amount to be paid to the DCT is immaterial. Leroux also contends there are "unusual circumstances" that preclude dismissal on this basis. In particular, Leroux asserts the taxes owed to the DCT, as well as others owed to the IRS, relate to certain real property known as "Farm 5." Leroux owned Farm 5 on the petition date. On July 31, 2025, the Court approved the sale of Farm 5 to American AgCredit ("**AmAg**").[13] However, AmAg decided to take title to Farm 5 on the effective date of the Plan rather than immediately. Leroux did not anticipate the delay in transferring title to AmAg, and the delay resulted in a higher than anticipated tax burden on Leroux. Leroux further asserts it did account for the taxes related to the sale of Farm 5, including property taxes, and built payment of those taxes into the Plan.

Section 1112(b)(4)(I) provides that a court shall either dismiss or convert a case for a debtor's "failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief." Even if cause is established under this section, § 1112(b)(2) gives a court discretion to deny dismissal or conversion if it finds "unusual circumstances" that establish that the requested conversion or dismissal is not in the best interests of creditors and/or the estate.[14] "The Code does

[8] ECF No. 233 at 3.

[9] Transcript of Trial ("Tran."), 33:2-25, 34-1.

[10] *Id.*, 36:11; 102:12-13.

[11] *Id.*, 102:17-21.

[12] *Id.*, 102:22-25.

[13] ECF No. 186.

[14] 11 U.S.C. § 1112(b)(2); *In re Franmar, Inc.*, 361 B.R. 170, 180 (Bankr. D. Colo. 2006).

not define 'unusual circumstances,' but the term contemplates 'conditions that are not common in Chapter 11 cases.'"[15] Additionally, the statute sets forth a four-part test the party opposing dismissal or conversion must establish. "Section 1112(b)(2) requires the objecting party to show a reasonable likelihood that (1) a plan will be confirmed within a reasonable time, (2) the cause established includes grounds other than continuing loss or diminution of the estate, (3) there exists a reasonable justification for the act or omission constituting cause, and (4) the act or omission will be cured within a reasonable time."[16]

The Court finds Leroux has established that unusual circumstances exist as to warrant denial of the Dismissal Motion on this ground. While sales of a debtor's property are common in Chapter 11 proceedings, it is uncommon for the buyer of such property not to take immediate possession. Indeed, at the time trial took place, nearly a year had passed since the Court approved the sale of Farm 5, and AmAg still had not taken title to the property. Further, Leroux has satisfied all four elements of the test set forth in § 1112(b)(2). As the Court will discuss in more detail below, while the Plan is not confirmable at this time, the Court believes it can be confirmed with certain adjustments. The UST alleged several causes for dismissal under § 1112(b)(2), not just continuing losses or diminution. Leroux's failure to timely pay the taxes owed to the DCT and IRS is justified because it did not anticipate continuing to pay such taxes after the sale of Farm 5, and the Plan provides for payment of these taxes. Because Leroux has established that unusual circumstances exist and has met all elements set forth in § 1112(b)(2), the Court will not dismiss or convert the case on this ground.

*3. Failure to Pay Quarterly UST Fees*

The final ground the UST asserts in support of the Dismissal Motion is that Leroux failed to pay quarterly fees to the UST in the amount of $20,894.95.[17] Leroux argues all UST Fees were paid in full as of March 20, 2026. In support of this assertion, Leroux attached two payment receipts. Both receipts show payments to the UST for quarterly fees on March 20, 2026: one for $10,894.95 and the other for $10,000.00.[18] At trial, the UST did not dispute that the fees were paid in full. Therefore, the Court finds this ground does not support dismissal or conversion of the Debtors' case.

Because the UST has not met its burden to show the case should be dismissed or converted on any of the grounds asserted, the Court will deny the Dismissal Motion.

[15] *In re Whetten*, 473 B.R. 380, 384 (Bankr. D. Colo. 2012) (quoting *In re Prods. Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008)).

[16] *Id.* (citing 7 *Collier on Bankruptcy*, ¶ 1112.05[2] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed.)).

[17] 11 U.S.C. § 1112(b)(4)(K).

[18] ECF No. 246, Ex. A.

## B. Applicable Standard for Confirmation

Section 1129(a) sets forth the requirements for confirming a Chapter 11 plan. A plan must satisfy all of the requirements in § 1129(a), except for § 1129(a)(8), before it can be confirmed.[19] The Debtors, as the plan proponents, bear the burden of proving the Plan complies with § 1129(a) by a preponderance of the evidence.[20]

The UST objects to confirmation of the Plan, and asserts that it does not comply with several requirements under § 1129(a), including that Leroux's estate is administratively insolvent, the Plan is not feasible, the Plan was proposed in bad faith, and the Plan does not comply with other sections of the Bankruptcy Code.

## C. Administrative Insolvency

The UST's first ground for denying confirmation of the Plan is that Leroux's estate is administratively insolvent and cannot satisfy the requirements of § 1129(a)(9). In particular, the UST asserts Leroux has not properly accounted for all administrative expense claims it must pay on the effective date and that even if Leroux's calculations are correct, it still does not have the cash available to pay all administrative expense claims on the effective date. In response, Leroux asserts it has agreements with several of its administrative expense creditors to pay those claims over time.

### *1. What Constitutes an Allowed Administrative Expense Claim*

First, the Court will address what constitutes an allowed administrative expense claim. The parties disagree whether a creditor must first file a motion requesting the allowance of an administrative expense claim. Indeed, the UST argues § 364 grants an automatic administrative priority claim to creditors that provide post-petition goods or services in the ordinary course of a debtor's business.[21] The Debtors disagree, and instead argue a creditor is not the holder of an allowed administrative expense claim until it asserts a right to such claim by motion.[22]

Section 1129(a)(9) provides, among other things, that for a plan to be confirmed, all allowed administrative expense claims must be paid in full on the effective date of the plan unless the holder of such claim agrees to different treatment.[23] Administrative expense claims are governed by § 503 of the Bankruptcy Code. Pursuant to § 503

---

[19] *In re Holthoff*, 58 B.R. 216, 218 (Bankr. E.D. Ark. 1985).

[20] *In re Saratoga and North Creek Railway, LLC*, 635 B.R. 581, 602 (Bankr. D. Colo. 2022).

[21] ECF No. 291, Brief Concerning the United States Trustee's Objection to Confirmation Under 11 U.S.C. § 1129(a)(9), ¶¶ 14-15.

[22] ECF No. 291, Debtors' Joint Brief Regarding 11 U.S.C. § 1129(a)(9) and Hearsay Issues at 1.

[23] 11 U.S.C. § 1129(a)(9)(A); *In re Molycorp, Inc.*, 562 B.R. 67, 77 (Bankr. D. Del. 2017).

(a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title . . .[24]

"Under § 503(b), the burden at the beginning is on the claimant to show reasonableness, necessity, and benefit to the estate."[25] As such, a creditor seeking payment of an administrative expense claim is generally required to file a motion requesting such claim be allowed.[26] However, an exception exists: post-petition debts incurred in the ordinary course of business automatically receive administrative priority status under § 364(b).[27] This means any post-petition expenses incurred in the ordinary course of Leroux's business automatically receive administrative priority status, regardless of whether those creditors filed motions requesting that such claims be allowed. This also means those claims must be paid in full on the effective date of the Plan, or those creditors must have agreed to treatment other than payment in full on the effective date.[28]

Leroux asserts only one creditor, SuperVeg, requested and was granted an allowed administrative expense claim.[29] While Leroux recognizes it has incurred post-petition debts in the ordinary course of its business, it contends none of these creditors have asked to be treated as administrative expense claimants.[30] Given the findings in the case law above, the Court concludes any creditor who provided post-petition goods

---

[24] 11 U.S.C. § 503(a)-(b).

[25] *In re Taco Bueno Restaurants, Inc.*, 606 B.R. 289, 302 (Bankr. N.D. Tex. 2019).

[26] *Id.* ("Requiring that a § 503 administrative expense be in an application also ensures that the bankruptcy court will have an opportunity to pass judgment on the administrative expense and prevent any unreasonable, unnecessary, and non-beneficial claims from being charged to the estate.").

[27] *In re Mayco Plastics, Inc.*, 379 B.R. 691, 697 (Bankr. E.D. Mich. 2008) (Indeed, "[s]ection 364(b) permits the Court to authorize a debtor in possession to incur unsecured debt other than in the ordinary course of business and also permits such debt to have an administrative expense claim under § 503(b)(1), but in that circumstance there must first be notice and a hearing. In other words, if the unsecured debt is incurred in the ordinary course of the debtor's business, then § 364(a) automatically grants it an administrative expense under § 503(b)(1)."); *In re Husting Land & Development, Inc.*, 255 B.R. 772, 777 (Bankr. D. Utah 2000) (citing *Martino v. First National Bank of Harvey (Matter of Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 423 (N.D.Ill. 1995) ("Under § 364(a), an unsecured debt incurred post-petition is allowable as an administrative expense only if incurred in the ordinary course of a debtor's business.").

[28] 11 U.S.C. § 1129(a)(9).

[29] Tran. at 52:8-10.

[30] *Id.* at 52:5-10; ECF No. 290 at ¶¶ 4 & 6.

and/or services in the ordinary course of Leroux's business has an allowed administrative expense claim pursuant to § 364(a).

*2. No proof Administrative Expense Claimants Have Consented to Different Treatment*

Section 1129(a)(9) requires that allowed administrative expense claims be paid in full on the effective date of the plan unless the holder of such claim agrees to different treatment. Leroux asserts it has agreements with several of its administrative expense claimants to pay those claims over time rather than in full on the effective date.[31] The UST disagrees and asserts that SuperVeg is the only claimant that agreed to different treatment. Accordingly, the UST contends Leroux must pay the remaining administrative expense claims in full on the effective date.

"The language of Section 1129(a)(9) specifically requires each holder of each particular claim to enter into an agreement with the plan proponent to waive the right to payment of administrative expenses in full."[32] "Yet, while the Bankruptcy Code requires an agreement, it does not state the form which a consent to a different treatment must be given, nor does it indicate the time or stage in a Chapter 11 case that such consent may be obtained."[33] While some courts have held that an agreement under § 1129(a)(9) requires affirmative consent, others have held a claimant's consent to different treatment may be implied through its conduct in certain circumstances.[34]

The only administrative expense claimant that expressly consented to different treatment is SuperVeg.[35] No other claimant appeared at the hearing or otherwise filed anything with the Court indicating their assent to different treatment. Instead, Ms. Tuft testified Leroux has agreements with several of its post-petition creditors to pay them over time.[36] While the Court found Ms. Tuft a credible witness, testimony alone is

---

[31] Tran. at 48:1-4.

[32] *In re Digital Impact, Inc.*, 223 B.R. 1, 7 (Bankr. N.D. Okla. 1998).

[33] *In re Molycorp.*, 562 B.R. at 78.

[34] *In re Jankins*, 184 B.R. 488, 492 at n. 8 (Bankr. E.D. Va. 1995) ("This Court, however, construes the term 'has agreed' in Section 1129(a)(9) as requiring the affected creditor's affirmative concurrence and not mere failure to object . . . ."); *In re Wilson Enterprises, Inc.*, 2013 WL 5352697, at *8 (Bankr. E.D. Ill. Sept. 23, 2013) ("In this court's view, those courts requiring affirmative consent have the better interpretation of 'agreed.'"); *In re Teligent, Inc.*, 282 B.R. 765, 771 (Bankr. S.D.N.Y. 2002) ("While § 1129(a)(9) requires agreement, it does not state that the agreement must be express."); *see In re Facciponte*, 1992 WL 722289, at *1 (Bankr. N.D.N.Y. Oct. 7, 1992) (finding that creditor's failure to object to chapter 13 constituted acceptance where the plan expressly provided that failure to object would constitute an agreement to the proposed treatment of its claim.").

[35] Tran. at 10:15-18.

[36] Tran. at 48:1-4. The Court acknowledges the UST raised a hearsay objection at trial to Ms. Tuft's testimony that Leroux has agreements with several of its post-petition creditors. While the parties briefed

insufficient to establish an agreement between Leroux and its administrative expense claimants.[37]

Furthermore, the Court is unpersuaded by Leroux's argument that the administrative expense claimants' voting in favor of the Plan and/or not objecting to it implies those creditors agreed to different treatment. While certain circumstances allow voting in favor of a plan to indicate implied consent to different treatment, Leroux's case does not meet those circumstances. For example, in *In re Teligent, Inc.*, the debtor was administratively insolvent and its only hope for confirming a plan required administrative expense claimants to accept substantially less than payment in full.[38] Adding to the difficulty was the large number of administrative claimants. As such, the debtor's plan contemplated a $4 million "claim fund" to pay the administrative expense and priority creditors. Certain administrative claims would be paid in full on the effective date while the remaining claims would be paid on a *pro rata* basis. The debtors then prepared, and the court approved, a "consent form" that was distributed to the administrative expense claimants. The consent form informed the claimants that insufficient funds existed to pay their claims in full and that unless they agreed to accept different treatment, the debtor's case would likely be dismissed or converted. The form asked the administrative expense creditors to make an election from three kinds of treatment and included a notice that the debtor intended to request the court rule that any administrative expense creditor who failed to return a consent form should be deemed to have agreed to accept the treatment contemplated under the plan, including not having their claim paid in full on the effective date. At confirmation, the court acknowledged that silence or inaction generally may not be treated as acceptance but concluded that § 1129(a)(9) was satisfied because the administrative expense creditors had been warned that failure to return the consent form would be deemed an acceptance of different treatment.

Here, the Plan and Disclosure Statement state Leroux intends to pay its administrative expenses on the effective date.[39] In particular, the disclosure statement provides that "[s]ignificantly, Leroux anticipates paying its administrative expenses by the Effective Date of the Plan **or over time by agreement with the largest**

---

the issue for the Court, the Court concludes it need not determine whether Ms. Tuft's testimony is admissible at this time because her testimony alone is insufficient to prove the existence of agreements between Leroux and its creditors.

[37] *In re Mountain City Meat Co., Inc.*, 2010 WL 11833699, at *2 (Bankr. D. Colo. Aug. 2, 2010) (confirming a Chapter 11 plan where debtor provided a report of administrative expense claimants that consented to different treatment); *In re Sweetwater*, 884 F.2d 1323, 1324 (10th Cir. 1989) (finding that § 1129(a)(9) was satisfied because the plan included the written agreement between the debtor and administrative expense claimants consenting to different treatment).

[38] *In re Teligent*, 282 B.R. at 767-68.

[39] ECF No. 264 at 15; ECF No. 265, § 4.1.

**administrative expense claimants, Sunfair Marketing and SuperVeg**."[40] The Plan provides that, "[Administrative expense claims] shall be paid in full on the Effective Date of the Plan, or treated as otherwise agreed to by the particular holders of such Claims." Neither the Plan nor Disclosure Statement warns administrative expense claimants that voting in favor of the Plan means they have consented to treatment other than payment of their claims in full on the effective date. Furthermore, the language in the Disclosure Statement might lead administrative expense claimants to believe that only Sunfair and SuperVeg's claims will be paid over time, while all other administrative expense claims are paid in full on the effective date. Absent language stating that a creditor's acceptance of the Plan means they have agreed to different treatment, the Court will not construe an administrative expense claimant's acceptance of the Plan or failure to object thereto as implied consent to treatment other than payment in full on the effective date.

Because consent to different treatment cannot be implied and because there is no documentation to show that other administrative expense claimants, other than SuperVeg, agreed to have their claims paid over time, all administrative expense claims, other than SuperVeg's, must be paid in full on the effective date of the Plan.

*3. Leroux has Insufficient Funds to Pay its Administrative Expense Claims on the Effective Date*

At trial, the UST argued that, even removing those claimants that have agreed to other treatment, Leroux will owe approximately $287,912.31 in administrative expense claims.[41] Meanwhile, the exhibit attached to Leroux's Disclosure Statement shows Leroux will owe approximately $206,149.42 on the effective date.[42] The Court concludes it need not determine which amount is correct because Leroux cannot pay either amount on the effective date. Indeed, Leroux's MOR for May 2026 shows it ended the month with only $15,288.69 in cash.[43] Ms. Tuft testified that several of the post-petition claims had already been paid.[44] Even removing these claims, Leroux will still owe approximately $119,000.00 on the effective date.[45] At trial, Ms. Tuft did not

---

[40] Leroux Ex. B, Disclosure Statement, § IX (emphasis added).

[41] UST Ex. 1, May 31, 2026, A/P Aging Summary Report (admitted for demonstrative purposes only); Tran. at 199:4-9.

[42] Leroux Ex. B, at Ex. C A/P Aging Summary Report as of March 27, 2026.

[43] UST Ex. 24, May 2026 MOR at 13.

[44] Tran. at 69:2-25; 70:1-20.

[45] The Court did not remove the amount owing to the Delta County Treasurer in its calculation. While Ms. Tuft testified the $27,152.44 owed to the DCT will be paid upon the transfer of Farm 5, such transfer had not occurred as of the date of the confirmation hearing, nor has Leroux indicated since then that Farm 5 had been transferred. Even if the Court were to remove the amount owed to the DCT, Leroux still owes $91,863.88 on the effective date, which is more than the cash it currently has on hand.

dispute that Leroux does not have the funds to pay all administrative expenses on the effective date, or that it would even have such expenses fully paid by the end of the year.[46]

Because Leroux will not be able to pay all of its administrative expenses on the effective date, § 1129(a)(9) is not satisfied. If Leroux has agreements with some of its administrative expense claimants to pay those claims over time, then Leroux will need to provide documentation evidencing those agreements. Alternatively, Leroux could file an amended plan that expressly warns administrative expense claimants that failing to object will be deemed consent to treatment other than payment in full on the effective date. Either way, until Leroux provides evidence of these agreements, files an amended plan, or shows it can pay all its administrative expense claims on the effective date, the Court must sustain this objection and deny confirmation of the Plan.

## D. Feasibility

Next, the Court will briefly address the Plan's feasibility.[47] The UST contends the Plan is not feasible for several reasons, including that Leroux cannot keep up with its post-petition expenses and that the projections do not account for $307,306 in administrative expenses that must be paid before Leroux accumulates its $150,000 cash reserve, as discussed below. Given the Court's findings regarding Leroux's administrative expense claims, the projections must be updated to reflect the expenses Leroux must pay on the Plan's effective date. This also means Leroux may need to adjust when it can begin building its working capital reserve, as well as how long that process may take. Further, Ms. Tuft testified at the hearing that Leroux recently acquired several new customers.[48] Leroux had to spend money to bring on these new customers, which accounts for some of the decline in Leroux's funds and increase in its post-petition debt.[49] However, Leroux expects to see an increase in available cash for unsecured creditors as a result of these new customers, and it even implemented price increases for these customers to increase available cash.[50] These increases were too recent to be reflected in Leroux's projections.[51] As such, the Court concludes updating the projections to reflect the revenue brought in by the new customers, as well as the updated administrative expenses, will aid in determining whether the Plan is feasible. Therefore, the Court will not make a determination on this objection until the Debtors provide updated projections.

---

[46] Tran. at 90:23-25; 92:25, 93:1-3.

[47] 11 U.S.C. § 1129(a)(11).

[48] Tran. at 102:12-13.

[49] *Id.* at 105:15-20; 129:10-12; 131:9-11, 131:18-23; 139:7-9.

[50] *Id.* at 43:7-11; 168:10-18.

[51] *Id.* at 43:7-14.

## E. Good Faith

The UST further contends the Plan was not proposed in good faith because it incentivizes the non-payment of unsecured creditors. In particular, the UST contends unsecured creditors will only be paid after administrative expenses, priority claims, operating expenses, and secured debt payments are made, and only after the Debtors have built up "working capital reserves." These working capital reserves are funds Leroux and Tuft may draw on for emergencies. The Plan requires Leroux to have a working capital reserve of $150,000 and for Tuft to maintain a $50,000 reserve. The Debtors must meet these thresholds before any of the Debtors' income can be used to pay unsecured creditors, and the Debtors have complete discretion over these funds. However, the Plan has no "safeguards" to prevent the Debtors from spending down their reserves. As such, the UST is understandably concerned the Debtors will continue to spend down their reserves, so they never reach the required $150,000 and $50,000 thresholds, all but ensuring unsecured creditors receive nothing over the life of the Plan. The UST further asserts that because unsecured creditors get paid only if funds exceed the working capital reserve thresholds, creditors have no way of knowing whether they are owed anything during the Plan term or whether the Debtors operated in good faith when drawing down their reserve funds.

Section 1129(a)(3) provides that a plan may only be confirmed if it has been proposed in good faith and not by any means forbidden by law.[52] "The test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purpose of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions."[53] "The Tenth Circuit also requires the courts to consider whether the debtor intended to abuse the judicial process, the purpose of the reorganization, the debtor's post-petition conduct, and the plan itself."[54] The good faith requirement is narrowly construed, is evaluated on a case-by-case basis, and assessed in the light of the totality of the circumstances.[55]

While the Court understands the UST's concerns about the working capital reserves and their effect on the Debtors' ability to pay unsecured creditors, the Court concludes that this provision does not indicate the Plan was proposed in bad faith. Indeed, the provision at the center of the UST's good faith objection did not deter the

[52] 11 U.S.C. § 1129(a)(3).

[53] *Travelers Ins. Co. v. Pikes Peak Water Co.* (*In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1459 (10th Cir. 1985) (quoting *Gundy v. United States*, 728 F.2d 484, 488 (10th Cir. 1984); *In re 303 Investments, Inc.*, 662 B.R. 1, 9 (Bankr. D. Colo. 2024).

[54] *In re 303 Investments*, 662 B.R. at 9.

[55] *Id.*; *In re Walker*, 628 B.R. 9, 16 (Bankr. E.D. Pa. 2021).

creditors it affects from voting for the Plan.[56] The UST drafted, and the Court approved, language for the Disclosure Statement alerting unsecured creditors that they may not get paid if the Debtors drew down their working capital reserves below the required thresholds.[57] This warning was bolded. Nevertheless, none of the unsecured creditors rejected the Plan. Further, Ms. Tuft testified Leroux's working capital reserve is necessary for it to continue operating and reorganize, and that Leroux understands the funds are to be used only for emergencies.[58] Similarly, Tuft testified he understands his reserve is to be used only for emergencies and not for "frivolous" expenditures.[59] The Court found both Ms. Tuft's and Tuft's testimony credible. Because the creditors affected by the provision voted to confirm the Plan notwithstanding the provision, and because the reserves are necessary for Leroux's reorganization, the Court concludes the Plan was not proposed in bad faith and overrules this objection to confirmation.

## F. Specificity of Treatment of Unsecured Creditors

Finally, the Court will address the UST's argument that the Plan doesn't comply with § 1123(a)(3) and thus cannot be confirmed pursuant to § 1129(a)(1). Section 1123(a)(3) provides that a Chapter 11 plan "shall specify the treatment of any class of claims or interests that is impaired under the plan."[60] The UST asserts the Plan does not comply with this provision because it does not include specific, defined payments to unsecured creditors. Instead, the Plan provides that unsecured creditors will be paid from the Debtors' Net Operating Income, which is the income received after payments to secured creditors and priority and administrative expense claims are made, and Leroux and Tuft have reached their respective working capital thresholds. The UST contends the Plan should specify the dollar amounts unsecured creditors can expect to receive for each payment made.

Few courts have addressed how specific a plan's treatment of a creditor must be to satisfy § 1123(a)(3). While some courts have held that a plan must provide a specific payment amount, others have upheld plans that do not specify exact payment amounts.[61] Cases in which courts require more specificity generally involve plan

---

[56] *In re Walker*, 628 B.R. at 18 ("In evaluating the good faith of the proposed Plan, it is extremely significant that the unsecured class of creditors voted overwhelmingly in support of the Plan. The parties most directly affected prefer that this Plan be confirmed.").

[57] Leroux Ex. B, § X.

[58] Tran. at 79:24-24, 80:1-18.

[59] *Id.* at 182:9-19.

[60] 11 U.S.C. § 1123(a)(3).

[61] See *Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346, 1353 (5th Cir. 1989) ("For instance, a plan providing for future cash payments must specify the amount of payments to be made and the date when such payments will be due.") (quoting 5 *Collier on Bankruptcy* at 1123-7); *In re Butler*, 42 B.R. 777, 780 (Bankr. E.D. Ark. 1984) ("Therefore, § 1123(a)(3) requires the plan to specify the amount of

language that fails to provide sufficient information for creditors to make an informed decision. For example, in In re Butler, the court denied confirmation of a plan that provided virtually no information about the treatment of unsecured claims.[62] Similarly, in *Matter of Sandy Ridge Development Corp.*, the Fifth Circuit Court of Appeals agreed with the bankruptcy court's findings that § 1123(a)(3) wasn't satisfied because the plan was completely devoid of specificity as to how certain property would be divided to pay creditors.[63] The Court concludes these cases are distinguishable from the present one because the affected creditors in the instant case received adequate information regarding the treatment of their claims under the Plan. Indeed, the affected creditors are those with unsecured claims. Both the Plan and Disclosure Statement provide that unsecured creditors will be paid "within thirty (30) days after the end of the calendar year" from funds in excess of the Debtors' working capital reserves.[64] The Disclosure Statement also provided language explaining how payments to unsecured creditors work under the Plan and the potential risks such creditors may face if they do not object to the Plan and/or vote to confirm it.[65] The Plan also references this language.[66] The language is clear that unsecured creditors will receive a *pro rata* distribution only if funds exceed the Debtors' respective working capital reserves at the end of the calendar year.[67] The language further provides that unsecured creditors will not receive a distribution if no excess funds exist.[68] The Court concludes that this language, along with additional language in the Plan regarding the treatment of unsecured creditors, is specific enough to inform the affected creditors how their claims will be treated under the Plan. Therefore, the Court overrules this objection.

---

payments to be made and the date when such payments will be due.") (quoting 5 Collier on Bankruptcy § 1123.01[3] (15th Ed. 1982)); *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1163 at n. 5 (5th Cir. 1993) (finding that plan provision that provided unsecured creditors would benefit pro rata from any sale or refinance in excess of secured creditor's claim satisfied § 1123(a)(3) despite not knowing exactly how much creditors might receive).

[62] *In re Butler*, 42 B.R. at 780 ("Article III of the plan provides for the treatment of all classes under the plan. Not one sentence of Article III deals with treatment of claims in Class IV, except one indirect comment regarding interest. The plan does not state what percentage this class will receive, nor when it will be paid.").

[63] *Matter of Sandy Ridge Development Corp.*, 881 F.2d at 1352-52.

[64] Leroux Ex. A, § 7.1; Leroux Ex. B, § III.

[65] Leroux Ex. B, § X, "Risk to Creditors."

[66] Leroux Ex. A, § 7.1.

[67] *Id.*; Leroux Ex. B, § X ("As discussed in Part IX above, Leroux and Tuft will only make payments to unsecured creditors if (1) there is sufficient revenue to build reserve funds totaling $150,000 and $50,000, respectively; and (2) there is money in excess of those reserve funds available at the end of each calendar year.").

[68] Leroux Ex. B, § X ("If the Debtors draw down on their reserve funds and do not replenish those reserves by the end of the calendar year, unsecured creditors will not receive a distribution for that calendar year.").

**CONCLUSION**

For the reasons stated above, the Court

ORDERS the Dismissal Motion is DENIED. The Court

FURTHER ORDERS confirmation of the Debtors' Plan is DENIED without prejudice. The Court

FURTHER ORDERS **on or before November 16, 2026**, the Debtors shall file an amended plan with new projections.

Dated: September 30, 2026.

BY THE COURT

Michael E. Romero, Judge
United States Bankruptcy Court